IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

CHARANJIT AND PARBHUR SINGH,
    Plaintiff,

v.

LEAD CASE:
CIVIL NO. 2:16cv276

INTERACTIVE BROKERS LLC,
BRAR CAPITAL LLC, and
VIKAS BRAR,
    Defendants.


BRAR FAMILY PARTNERSHIP L.P.,
    Plaintiffs,

v.

CIVIL NO. 2:16cv277

INTERACTIVE BROKERS LLC,
BRAR CAPITAL LLC, and
VIKAS BRAR,
    Defendants.

## OPINION AND ORDER

This matter comes before the Court on Defendant Interactive Brokers LLC's Motions to Compel Arbitration ("Motions to Compel") filed in the above-captioned cases on August 23, 2016. See Civil No. 2:16cv276 ("Singh Case"), ECF No. 5; Civil No. 2:16cv277 ("BFP Case"), ECF No. 6. In these motions, Interactive Brokers LLC ("IB") requests that, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3 and 4, the Court compel arbitration of all claims brought against IB in each case and stay the actions pending completion of arbitration.[1] For the reasons stated herein, IB's Motions to Compel are **GRANTED**, and the instant action (Lead Case No. 2:16cv276) is **STAYED** for the shorter of five (5) months or when arbitration is completed.

---

[1] On November 23, 2016, the Court consolidated these two actions pursuant to Rule 42(a) of the Federal Rules of Civil Procedure. See Singh Case, ECF No. 23; BFP Case, ECF No. 25.

1

I. **PROCEDURAL AND FACTUAL BACKGROUND**

On June 8, 2016, Charanjit and Parbhur Singh ("the Singhs") and Brar Family Partnership L.P. ("BFP")[2] (collectively, "Plaintiffs"), filed lawsuits against the Singhs' nephew, Vikas Brar; his financial advising firm, Brar Capital LLC (collectively, "Brar Defendants"); and IB, a broker-dealer and securities investment firm. Singh Case, ECF No. 1; BFP Case, ECF No. 1. These lawsuits stem from two IB investment accounts held by Plaintiffs: the Singhs' joint account established in August 2011 ("Joint Account") and BFP's account established in March 2012 ("Partnership Account"). See Amended Compl., Singh Case, ECF No. 2 ¶ 21; BFP Case, ECF No. 3 ¶ 21. The Joint Account was created by means of a document entitled "Interactive Brokers LLC Account Application for Financial Advisor Clients for Individual or Joint Account Holders" (hereinafter "Joint Account Application"), and the Partnership Account was created by means of a document entitled "Interactive Brokers LLC Account Application for Financial Advisor Clients for Trust Accounts" (hereinafter "Partnership Account Application"). Id. Both applications name Vikas Brar as the "Financial Advisor" for the accounts and Brar Capital LLC as the "Name of Advisor's Firm." Id. While the Singhs admit that the Joint Account Application contains signatures bearing their names, they claim that these signatures were not authored by either Charanjit or Parbhur Singh. Singh Case, ECF No. 2 ¶ 21. The Singhs do not deny that they signed the Partnership Account Application. BFP Case, ECF No. 3.

According to the Amended Complaints, by August 2015, both the Joint Account and the Partnership Account consisted almost entirely of options on the VXX, which is an exchange-traded note designed to expose options positions to the CBOE Volatility Index ("VIX"). See Singh Case, ECF No. 2 ¶ 30; BFP Case, ECF No. 3 ¶ 31. On August 20, 2015, the Joint Account was worth $406,794.04 and the Partnership Account was worth $1.8M. See Singh Case, ECF

---

[2] The Singhs are the general partners of BFP. Amended Compl., BFP Case, ECF No. 3 ¶ 3.

2

No. 2 ¶ 30; BFP Case, ECF No. 3 ¶ 33. Shortly thereafter, the stock market plunged, and by August 21, 2015, the value of the Joint Account dropped to a value of –$409,565.95, with a margin deficit of approximately $1.2M. Singh Case, ECF No. 2 ¶ 32. By August 24, 2015, the value of the Partnership Account dropped to a value of $651,811.26, with a margin deficit of approximately $1.79M. BFP Case, ECF No. 3 ¶¶ 35–38. To cover these significant margin deficits, IB liquidated the positions in both accounts using what Plaintiffs refer to as IB's "proprietary 'autoliquidation' program." See Singh Case, ECF No. 2 ¶¶ 32–33; BFP Case, ECF No. 3 ¶¶ 39, 42. After liquidation, both the Joint Account and the Partnership Account had insufficient funds to satisfy their margin debts, so IB demanded approximately $461,000 from the Singhs and $1.72M from BFP to cover their respective debts. See Singh Case, ECF No. 2 ¶¶ 32–33; BFP Case, ECF No. 3 ¶¶ 39, 42. When Plaintiffs failed to pay, IB commenced arbitration proceedings against Plaintiffs at the Financial Industry Regulatory Authority ("FINRA") in November 2015. See Mem. in Support of Mot. to Compel ("IB Mem."), Singh Case, ECF No. 6 at 8; BFP Case, ECF No. 7 at 8; see also Declaration of John Nielands ("Nielands Declaration" or "Nielands Decl."), Singh Case, ECF No. 7, Exs. G & H; BFP Case, ECF No. 8, Exs. G & H.

On June 14, 2016, the Singhs and BFP filed Amended Complaints, both of which bring the following six counts against IB: "Violations of § 10(b) of the Securities Exchange Act, 15 U.S.C. 78j, and Rule 10b-5 promulgated thereunder" for unlawful liquidation of Plaintiffs' accounts (Count I); "Registration Violations of Florida Blue Sky Laws," Fla. Stat. §§ 517.12 & 517.211, and "Registration Violations of Virginia Blue Sky Laws," Va. Code §§ 13.1-501, 522, for facilitating and aiding unregistered investment activity by the Brar Defendants (Counts II and III); "Wrongful Liquidation Under Contract" for breach of IB's "standard form of contract"

3

governing its liquidation procedures (Count IV); "Failure to Liquidate in a Commercially Reasonable Manner" relating to IB's liquidation of Plaintiffs' accounts (Count V); and "Negligence" relating to IB's facilitation of unregistered investment activity by the Brar Defendants (Count VI). See Singh Case, ECF No. 2 at 8–11; BFP Case, ECF No. 3 at 9–12.

On August 23, 2016, IB filed the instant Motions to Compel Arbitration and supporting memoranda. See Singh Case, ECF No. 5 and 6; BFP Case, ECF No. 6 and 7. On September 6, 2016, Plaintiffs filed their respective memoranda in opposition ("Resp.") to IB's Motions to Compel. See Singh Case, ECF No. 11; BFP Case, ECF No. 12. On September 9, 2016, IB filed reply briefs. See Singh Case, ECF No. 14; BFP Case, ECF No. 16. On October 24, 2016, counsel for Plaintiffs and IB appeared before the Court and presented oral argument on IB's Motions to Compel. See Singh Case, ECF No. 22; BFP Case, ECF No. 23.

## II. APPLICABLE LAW

IB argues that the Singhs and BFP entered into mandatory arbitration agreements with IB when they opened the Joint Account and Partnership Account, respectively, and that the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., requires the Court to enforce these agreements as written and compel Plaintiffs to arbitrate.

The FAA states:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The FAA further mandates that, in the event of an alleged failure, neglect, or refusal to arbitrate, the court must compel arbitration if it is satisfied that "the making of the agreement for arbitration . . . is not in issue." Id. § 4. If, however, the court determines that the making of the agreement is at issue, the court must proceed to trial on that issue. Id.; Gibbs v.

PFS Investments, Inc., 209 F. Supp. 2d 620, 624 (E.D. Va. 2002) (citing A/S Custodia v. Lessin Intern., Inc., 503 F.2d 318 (2d Cir. 1974)).

The FAA applies to contracts "evidencing a transaction involving commerce," 9 U.S.C. § 2, and it defines "commerce" as "commerce among the several States," id. § 1. A sufficient interstate nexus is established for purposes of this section where "the contracting parties were located in different states and performance was to occur across state lines." Gibbs, 209 F. Supp. 2d at 625. It is well-established that transactions involving the purchase and sale of securities on a national exchange involve "commerce" under this definition. See, e.g., Shearson/Am. Exp., Inc. v. McMahon, 482 U.S. 220, 226 (1987) (customer agreement between customer and securities broker was a transaction involving commerce under the FAA).

Once a court determines that the contract containing the arbitration agreement falls under the FAA, "arbitration may only be judicially compelled when the parties have agreed to it, and then only for those kinds of disputes that the parties have agreed to submit to arbitration." Zandford v. Prudential-Bache Sec., Inc., 112 F.3d 723, 727 (4th Cir. 1997). In other words, there is a two-step inquiry when deciding whether to compel arbitration under the FAA: the court must (1) determine whether a binding arbitration agreement exists between the parties and then (2) determine whether the dispute falls within the parameters of the arbitration agreement. Hightower v. GMRI, Inc., 272 F.3d 239, 242 (4th Cir. 2001).

### III. PLAINTIFFS ENTERED INTO VALID AND BINDING ARBITRATION AGREEMENTS WITH IB.

#### A. THE JOINT ACCOUNT APPLICATION AND THE PARTNERSHIP ACCOUNT APPLICATION CONTAIN A MANDATORY ARBITRATION CLAUSE.

To conduct the first stage of this inquiry, the Court reviewed the relevant documents in the case. In support of its Motions to Compel, IB filed the Nielands Declaration, which attaches several documents as exhibits. See Singh Case, ECF No. 7; BFP Case, ECF No. 8. In the Singh

5

Case, Exhibit B purports to be a copy of the Joint Account Application that was used to set up the Singh's Joint Account in August 2011. ECF No. 7 ¶ 12. The Singhs do not dispute this. See Singh Case, ECF No. 2 ¶ 21; Resp., ECF No. 11 at 3–4. In the BFP Case, Exhibit B purports to be a copy of the Partnership Account Application that was used to set up the Partnership Account in March 2012. ECF No. 8 ¶ 12. It contains the signatures of Parbhur and Charanjit Singh, BFP's general partners, throughout the document. Id., Ex. B at 26, 28, 29, 32, 33, 39, 40, 45. BFP does not dispute that Exhibit B is the Partnership Account Application or that it was signed by the Singhs. See BFP Case, Resp., ECF No. 12 at 4, 10.

Section IV of both the Joint Account Application and the Partnership Account Application incorporates by reference a document entitled "The Interactive Brokers Customer Agreement":

> The Interactive Brokers Customer Agreement governs the relationship between Customer and Interactive Brokers and sets forth the terms and conditions governing Customer's IB account. The Customer Agreement has been provided separately to Customer as a part of a package of documents labeled: ***Interactive Brokers LLC Agreements and Disclosure Documents.***

Singh Case, Nielands Decl., Ex. B at 17; BFP Case, Nielands Decl., Ex. B at 27. In both the Singh Case and the BFP Case, the Interactive Brokers Customer Agreement ("Customer Agreement") is purportedly attached to the Nieland's Declaration as Exhibit F. While Plaintiffs do not admit either the authenticity of this document or the fact that they received it, both the Joint Account Application and the Partnership Account Application specifically identify the Customer Agreement and clearly state above the signature line that the "**CUSTOMER REPRESENTS THAT CUSTOMER HAS RECEIVED [THE CUSTOMER AGREEMENT] . . . AND HAS READ AND UNDERSTOOD AND INTENDS TO BE BOUND BY THE . . . CUSTOMER AGREEMENT.**" Singh Case, Nielands Decl., Ex. B at 20 (emphasis in original); BFP Case, Nielands Decl., Ex. B at 31 (emphasis in original).

Section 33 of the Customer Agreement is entitled "Mandatory Arbitration," which states in bold, all-capitalized text:

> • **ALL PARTIES TO THIS AGREEMENT ARE GIVING UP THE RIGHT TO SUE EACH OTHER IN COURT, INCLUDING THE RIGHT TO A TRIAL BY JURY, EXCEPT AS PROVIDED BY THE RULES OF THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED...**

See Singh and BFP Cases, Nielands Decl., Ex. F § 33. Section 33A continues:

> **Customer agrees that any controversy, dispute, claim or grievance between IB ... and Customer ... arising out of, relating to, this Agreement, or any account(s) established hereunder in which securities may be traded; any transactions therein; any transactions between IB and Customer; any provision of the Customer Agreement or any other agreement between IB and Customer; or any breach of such transactions or agreements, shall be resolved by arbitration ...**

Id. Section 33 also includes various other warnings related to arbitration, and subsection B contains a class-action exception to mandatory arbitration. Id.

The mandatory arbitration agreement contained in Section 33 of the Customer Agreement is binding on Plaintiffs and IB. The Singhs and BFP agreed to the terms of the Joint Account Application and the Partnership Account Application, respectively, when they agreed to establish accounts with IB. Both the Joint Account Application and the Partnership Account Application clearly identify the Customer Agreement and incorporate it by reference as the contract that "governs the relationship between Customer and IB." Singh Case, Nielands Decl., Ex. B at 22; BFP Case, Nielands Decl., Ex. B at 27. See Jefferson Hotel Associates Ltd. P'ship v. Algernon Blair, Inc., 836 F.2d 546, *2 (4th Cir. 1987) (unpublished) ("This circuit has rigorously enforced agreements to arbitrate, including those incorporated into the contract by reference.").

Furthermore, the arbitration agreements between IB and Plaintiffs are governed by the FAA. The Customer Agreement is a "contract evidencing a transaction involving commerce" as defined by Section 2 of the FAA. See McMahon, 482 U.S. at 226. And such commerce is

7

clearly "among the several States." See Gibbs, 209 F. Supp. 2d at 625. The Singhs, Virginia residents, and BFP, a Virginia limited partnership, opened accounts with IB, a Connecticut LLC, while the Brar Defendants, a Florida resident and a Florida LLC, allegedly conducted the trades and investments for the accounts. Amended Compl., Singh Case, ECF No. 2 ¶¶ 3–7; BFP Case, ECF No. 3 ¶¶ 3–6. Therefore, the Singhs and BFP have binding arbitration agreements with IB, and these agreements fall under the statutory mandate of the FAA.

### B. THE SINGHS' FAILURE TO SIGN THE JOINT ACCOUNT APPLICATION DOES NOT INVALIDATE THE CONTRACT.

The Singhs briefly argue in their opposition brief that the question of whether they have an enforceable contract with IB cannot be resolved without discovery because their signatures on the Joint Account Application were forged. Resp., ECF No. 11 at 13. But the Singhs are equitably estopped from making this claim. Critically, they are suing on the very contract that they are trying to repudiate for purposes of avoiding arbitration. In their Amended Complaint, Count IV for "Wrongful Liquidation Under Contract" alleges that IB breached its contract with the Singhs, and it identifies the relevant contract as "Interactive's standard form of contract." Singh Case, ECF No. 2 ¶ 56. The Singhs then purport to quote from this contract, stating that IB has the authority under this contract "to liquidate account positions in order to satisfy Margin Requirements without prior notice." Id. Though the Singhs do not provide a citation, this exact language is found in Section 11C of the Customer Agreement. Nielands Decl., Ex. F § 11(C).

Furthermore, the Nielands Declaration presents evidence that the Singhs actively used and benefitted from the Joint Account after it was created. See Nielands Decl. ¶ 22, Ex. L (April 2014 account activity statement showing the Singhs' withdrawal of $150,000); id. ¶ 23, Ex. M (form signed by Parbhur Singh on December 29, 2011, and sent to IB in order to revise information on the Joint Account Application). Plaintiffs do not dispute these claims.

This Court has already found in a similar context that, under the doctrine of equitable estoppel, a party may not "rely on the contract when it works to its advantage, and repudiate it when it works to its disadvantage." Jackson v. Iris.com, 524 F. Supp. 2d 742, 749 (E.D. Va. 2007) (internal citation omitted) (compelling arbitration despite lack of signature on contract containing arbitration agreement where non-signatory directly benefitted from other provisions of the contract); see also Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 418 (4th Cir. 2000) (asserting same). Therefore, notwithstanding the Singhs' lack of signature on the Joint Account Application, their reliance on and receipt of benefits from their contract with IB estops them from repudiating the arbitration clause contained in that contract.

### C. IB'S FAILURE TO COMPLY WITH FINRA RULE 2268 DOES NOT INVALIDATE ITS ARBITRATION AGREEMENTS WITH PLAINTIFFS.

Despite the mandatory arbitration provision contained in Section 33A of the Customer Agreement, Plaintiffs nonetheless argue that no valid arbitration agreement exists in this case. This argument rests on a two-part premise: (1) that arbitration agreements must comply with FINRA Rules to be valid and enforceable under the FAA, and (2) that the arbitration clause in this case is invalid because it violates FINRA Rule 2268 in multiple respects. For the reasons that follow, the Court finds Plaintiffs' argument to be without merit.

#### 1. FINRA Rule 2268

FINRA Rule 2268 ("Rule 2268") is entitled "Requirements When Using Predispute Arbitration Agreements for Customer Accounts." See Singh Case, Resp., ECF No. 11-3. It provides, in relevant part:

> (a) Any predispute arbitration clause shall be highlighted and <u>shall be immediately preceded by the following language in outline form</u>.
> This agreement contains a predispute arbitration clause. By signing an arbitration agreement the parties agree as follows:

    (1) All parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.

    (2) Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.

    (3) The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.

    (4) The arbitrators do not have to explain the reason(s) for their award unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first scheduled hearing date.

    (5) The panel of arbitrators may include a minority of arbitrators who were or are affiliated with the securities industry.

    (6) The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.

    (7) The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.

(b)     (1) In any agreement containing a predispute arbitration agreement, there shall be a highlighted statement immediately preceding any signature line or other place for indicating agreement that states that the agreement contains a predispute arbitration clause. <u>The statement shall also indicate at what page and paragraph the arbitration clause is located</u>.

    (2) Within thirty days of signing, a copy of the agreement containing any <u>such clause shall be given to the customer who shall acknowledge receipt thereof on the agreement or on a separate document</u>. . . .

(f) All agreements shall include a statement that "No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein."

<u>Id.</u> (emphasis added). Plaintiffs claim that the arbitration clause in the Joint Account Application and the Partnership Account Application violates sections (a)(1)–(7), (b)(1)–(2) and (f) of this rule. Resp., Singh Case, ECF No. 11 at 11; BFP Case, ECF No. 12 at 11. While Plaintiffs admit that the Customer Agreement "has at ¶ 33 language tracking Rule 2268," they claim that

10

reference to the Customer Agreement is "buried in the middle" of the application and "does not even mention an arbitration clause." Id. at 12. Plaintiffs also argue that they never acknowledged receipt of the Customer Agreement on the agreement or on a separate document as required under section (b)(2) of the rule. Id.

As a threshold matter, the Joint Account Application and the Partnership Account Application contain highly conspicuous warnings about the incorporated Customer Agreement in all-capitalized and bolded text. See supra Part III.A; Singh Case, Nielands Decl., Ex. B at 20; BFP Case, Nielands Decl., Ex. B at 31. Moreover, by entering into these agreements with IB, Plaintiffs expressly represented, as stated in the bold, all-capitalized language above the signature line, that they received the package of disclosure documents containing the Customer Agreement. Id. Thus, Plaintiffs acknowledged receipt as required by Rule 2268 § (b)(2).[3] The Joint Account Application and the Partnership Account Application also contain separate conspicuous warnings about the existence of the mandatory arbitration clause, which Plaintiffs admit in their briefs. Singh Case, ECF No. 11 at 10 (citing Nielands Decl., Ex. B at 20–21); BFP Case, ECF No. 12 at 10 (citing Nielands Decl., Ex. B at 31).

Furthermore, Section 33 of the Customer Agreement contains the exact language required under subsections (a)(1)–(3), (a)(6)–(7), and (f) of Rule 2268. See Singh and BFP Cases, Nielands Decl., Ex. F § 33. As for subsections (a)(4) and (a)(5), the discrepancies between the language required by these subsections and Section 33 are minor. First, Section 33 includes the first part of subsection (a)(4) but eliminates the qualifying phrase at the end: "unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first scheduled hearing date." See id. Second, instead of

---

[3] The Singhs are equitably estopped from denying this acknowledgment on the grounds that they did not sign the Joint Account Application. See discussion supra Part III.B.

11

stating that "[t]he panels of arbitrators <u>may</u> include a minority of arbitrators who were or are affiliated with the securities industry," <u>see</u> Rule 2268 (a)(5) (emphasis added), Section 33 of the Customer Agreement states "the panel of arbitrators <u>will typically</u> include a minority of arbitrators who were or are affiliated with the securities industry," Nielands Decl., Ex. F § 33 (emphasis added). Finally, Section 33 also deviates, in part, from subsection (b)(1) of Rule 2268. Even though the Joint Account Application and the Partnership Account Application include a "highlighted statement immediately preceding [the] signature line . . . that states that the agreement contains a predispute arbitration clause," the warnings fail to "indicate at what page and paragraph the arbitration clause is located" as required under the rule. <u>See</u> Singh Case, Nielands Decl., Ex. B at 20; BFP Case, Nielands Decl., Ex. B at 31.

In summary, the Court finds that Section 33 of the Customer Agreement violates subsections (a)(4), (a)(5), and (b)(1) of Rule 2268.

### 2. FINRA Rules Do Not Trump the Clear Mandate of the FAA.

The next issue before the Court is what impact, if any, such violations have on an otherwise valid and enforceable arbitration agreement under the FAA. Plaintiffs argue that the issue of whether there is a valid arbitration agreement between parties "is not governed by the FAA . . . but by whether IB complied with FINRA Rules." Resp., Singh Case, ECF No. 11 at 8; BFP Case, ECF No. 12 at 8. In other words, if an arbitration agreement violates Rule 2268, it is null and void. Plaintiffs' purported support for this claim is a single FINRA Board of Governors' decision issued in 2014, <u>In the Matter of Department of Enforcement v. Charles Schwab & Co., Inc. ("Schwab")</u> (No. 2011029760201) (hereinafter "Schwab Decision"), which held that the FAA did not preempt the FINRA rule requiring arbitration clauses to contain a class-action exception and thus held that FINRA could enforce its class-action rule against Schwab despite Schwab's argument that the FAA requires enforcement of arbitration agreements

12

as written even if the terms deviate from FINRA rules. Singh Case, ECF No. 11-2 at 16; BFP Case, ECF No. 12, Ex. 2 at 16. However, for the reasons that follow, the Schwab Decision is of no avail here.

First, although the decision affirms that "FINRA's arbitration rules apply to Schwab," it also concedes that the FAA still "appl[ies] to this case because it governs virtually every arbitration agreement arising out of a commercial transaction." Id. This is directly contrary to Plaintiffs' assertion that the instant case "is not governed by the FAA." Resp., Singh Case, ECF No. 11 at 8; BFP Case, ECF No. 12 at 8. Indeed, the issue in the Schwab Decision was not whether the FAA applied, but whether its mandate was "overridden by a contrary congressional command." Singh Case, ECF No. 11-2 at 18 and BFP Case, ECF No. 12, Ex. 2 at 18 (quoting CompuCredit Corp. v. Greenwood, 132 S. Ct. 665, 669 (2012) (internal citation omitted)). Disagreeing with the finding of the Hearing Panel below, the Board of Governors in the Schwab Decision found that "FINRA Rule 2268 and Rule 12204 of the Customer Code demonstrate a statutorily authorized intent to overcome the FAA." Id. But the Board's ultimate holding was much narrower than Plaintiffs suggest. It held that FINRA was empowered to "enforce its existing rules . . . even when there is a valid predispute arbitration agreement between a firm and its customers." Id. at 28 (emphasis added). Nowhere does the Board state that an otherwise valid arbitration agreement under the FAA becomes null and void if it violates FINRA Rule 2268 or any other FINRA rule.

Second, even if it did, the Schwab Decision has little persuasive value here. The decision was not handed down by a court of law but by FINRA's Board of Governors, an administrative body with an obvious interest in the outcome of the decision. Furthermore, rather than appealing the decision after remand to the Hearing Panel, Schwab chose to resolve the matter by entering

into a settlement agreement to pay a $500,000 fine, remove its class-action waiver from all customer agreements, and waive its right to appeal.[4]

Therefore, the controlling precedent before this Court is the Supreme Court's directive that only Congress may enact exceptions to the FAA in order to invalidate otherwise valid arbitration agreements. See Shearson/Am. Exp., Inc. v. McMahon, 482 U.S. 220, 226 (1987) (The FAA "mandates enforcement of agreements to arbitrate statutory claims. Like any statutory directive, the [FAA's] mandate may be overridden by a contrary congressional command."); AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 352 (2011) (holding that a California law requiring classwide arbitration was preempted by the FAA because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," which is to promote arbitration and enforce arbitration agreements according to their terms); Am. Exp. Co. v. Italian Colors Rest., 133 S. Ct. 2304, 2309 (2013) (finding no congressional intent in federal antitrust laws to override FAA's mandate by precluding a waiver of class arbitration).

FINRA Rules do not qualify as a "contrary congressional command" for these purposes. See, e.g., UBS Fin. Servs., Inc. v. Carilion Clinic, 706 F.3d 319, 328 (4th Cir. 2013) (holding that "different or additional contractual arrangements for arbitration can supersede the rights conferred on [a] customer by virtue of [a] broker's membership in a self-regulating organization such as [FINRA]") (quoting Kidder, Peabody & Co. v. Zinsmeyer Trusts P'ship, 41 F.3d 861, 864 (2d Cir. 1994)).

---

[4] Board Decision Finds Charles Schwab & Co. Violated FINRA Rules by Adding Waiver Provisions in Customer Agreements Prohibiting Customers From Participating in Class Actions; Reverses FINRA Hearing Panel Decision, FINRA News Release (April 24, 2014), http://www.finra.org/newsroom/2014/board-decision-finds-charles-schwab-co-violated-finra-rules-adding-waiver-provisions.

Finally, the Court is not persuaded by Plaintiffs' policy arguments that it should advance the law in this area or otherwise find the arbitration agreement in this case to be unconscionable due to its noncompliance with FINRA rules. See Resp., Singh Case, ECF No. 11 at 14; BFP Case, ECF No. 12 at 13.[5] In the instant case, IB's very minor deviations from FINRA Rule 2268 do not implicate FINRA's fundamental purposes of ensuring investor protection and market fairness. Plaintiffs cannot reasonably argue that, by changing a few words of Section 33A of the Customer Agreement to align more precisely with Rule 2268 §§ (a)(4) and (a)(5), or by including a page and paragraph citation to an already obvious warning clause pursuant to § (b)(1), Plaintiffs would have received more effective notice of their waiver of rights to a jury trial. Instead, Plaintiffs hint at a much broader argument that predispute arbitration agreements in broker-dealer customer contracts like IB's are per se unconscionable and should not be enforced in any context. See supra note 3. But, as noted above, such a position is contrary to the statutory mandate of the FAA and Supreme Court precedent and thus cannot prevail here.

## IV. THE MANDATORY ARBITRATION CLAUSE ENCOMPASSES ALL OF PLAINTIFFS' CLAIMS AGAINST IB.

Having determined that a valid and binding arbitration agreement exists between Plaintiffs and IB, the second stage of the Court's inquiry is to determine whether the parties actually agreed to arbitrate the types of claims that Plaintiffs have alleged against IB in their Amended Complaints. Section 33A of the Customer Agreement, which contains the mandatory

---

[5] At the hearing on IB's Motions to Compel, counsel for Plaintiffs also cited two law review articles to support these propositions: William Alan Nelson, II, Take It or Leave It: Unconscionability of Mandatory Pre-Dispute Arbitration Agreements in the Securities Industry, 17 U. Pa. J. Bus. L. 573, 575 (2015) (arguing that mandatory predispute arbitration agreements are "per se unconscionable because they require investors to involuntarily waive certain constitutional rights and provide narrow appellate avenues that effectively preclude judicial review of arbitral awards"), and Barbara Black & Jill I. Gross, Investor Protection Meets the Federal Arbitration Act, 1 Stan. J. Complex Litig. 1, 48 (2013) (analyzing the Schwab class-action waiver and arguing that courts should apply the Exchange Act and SRO rules over the FAA for purposes of investor protection).

15

arbitration provision at issue, is very broad. It requires that

> <u>any controversy, dispute, claim, or grievance</u> between IB . . . and Customer . . . <u>arising out of, or relating to this Agreement, or any accounts(s)</u> established hereunder in which securities may be traded; <u>any transactions therein,</u> any transactions between IB and Customer; <u>any provision of the Customer Agreement</u> or any other agreement between IB and Customer; or <u>any breach of such transactions or agreements,</u> shall be resolved by arbitration . . .

Singh and BFP Cases, Nielands Decl., Ex. F § 33A (emphasis added). Here, all of Plaintiffs' claims—including the claims regarding IB's auto-liquidation system (Count I and V), IB's alleged failure to verify and regulate the registration status of Plaintiffs' named financial advisors for the accounts (Counts II, III and VI), and IB's alleged breach of contract by wrongful liquidation (Count IV)—clearly fall under the arbitration provision because they are all disputes relating to the agreement between IB and Plaintiffs and/or Plaintiffs' accounts. Notably, Plaintiffs do not dispute this in their opposition briefs. Resp., Singh Case, ECF No. 11; BFP Case, ECF No. 12.

Because this Court has determined (1) that binding arbitration agreements exist between Plaintiffs and IB, and (2) their scope encompasses all of Plaintiffs' claims against IB, the Court **FINDS** that the FAA requires the Court to enforce the agreements and compel arbitration.

## V. THE LIKELIHOOD OF PIECEMEAL LITIGATION DOES NOT PREVENT ENFORCEMENT OF THE ARBITRATION AGREEMENTS.

As a last resort, Plaintiffs argue that compelling arbitration is not permitted here because the Brar Defendants are "necessary parties" who are not subject to the arbitration agreements at issue. Resp., Singh Case, ECF No. 11 at 14; BFP Case, ECF No. 12 at 5, 13. Plaintiffs reason that, because arbitration is only appropriate for "bilateral disputes" between the parties with the arbitration agreement, arbitration is not favored here. <u>Id.</u> Notably, Plaintiffs do not cite any authority for this proposition or explain why the Brar Defendants are necessary parties.

16

In any event, case law clearly refutes Plaintiffs' argument. In <u>Moses H. Cone Memorial Hospital v. Mercury Construction Corp.</u>, the Supreme Court held that "[the FAA] requires piecemeal resolution when necessary to give effect to an arbitration agreement." 460 U.S. 1, 3 (1983). The court then specified that "an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement." <u>Id.</u> at 20; <u>see also</u> <u>Dean Witter Reynolds, Inc. v. Byrd</u>, 470 U.S. 213, 213 (1985) ("[T]he [FAA] requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even when the result would be the possibly inefficient maintenance of separate proceedings in different forums."). Therefore, the allegedly "trilateral" nature of Plaintiffs' lawsuit does not impact this Court's decision to compel arbitration.

## VI. IB'S REQUEST FOR A STAY OF PROCEEDINGS

IB also requests in its Motions to Compel that the Court stay the instant action pending completion of arbitration pursuant to Section 3 of the FAA. Singh Case, IB Mem., ECF No. 6 at 25; BFP Case, ECF No. 7 at 19. Section 3 states:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. The directive of the FAA in this section, that the Court "<u>shall</u> . . . stay the trial of the action until such arbitration has been had," <u>id.</u> (emphasis added), has been interpreted by the Supreme Court to be mandatory, not discretionary. <u>See</u> <u>Byrd</u>, 470 U.S. at 218. Therefore, having found that all of Plaintiffs' claims against IB are "issues referable to arbitration under an

17

agreement in writing for such arbitration," this Court must stay the trial of these claims pending completion of arbitration pursuant to 9 U.S.C. § 3.

But the question remains whether Plaintiffs' claims against the Brar Defendants, which are not subject to an arbitration agreement, should also be stayed pending the completion of arbitration. IB suggests that that these claims are not subject to the FAA's mandatory stay and should "remain in this Court" as a parallel proceeding. Singh Case, IB Mem., ECF No. 6 at 25 n.19 (citing Byrd, 470 U.S. at 218). However, a district court may, in its discretion, stay the litigation of non-arbitrable claims like those against the Brar Defendants if the court deems it necessary or advisable. Summer Rain v. Donning Company/Publishers, Inc., 964 F.2d 1455, 1461 (4th Cir. 1992) (citing Moses H. Cone, 460 U.S. at 20 n.23). Where arbitrable and non-arbitrable issues are so intertwined that the resolution of the former directly impacts the resolution of the latter, a stay of the non-arbitrable issues pending completion of arbitration may be appropriate. Summer Rain, 964 F.2d at 1461.

In the instant case, Plaintiffs bring Counts I, II, and III of the Amended Complaints against IB and the Brar Defendants. These counts allege that the Brar Defendants, acting as the financial advisor for the Joint Account and Partnership Account, caused Plaintiffs significant financial losses by unlawfully trading in securities and failing to register as investment advisors as required by Florida and Virginia Blue Sky Laws. Singh Case, ECF No. 2 at 8–9; BFP Case, ECF No. 3 at 9–10. These counts further allege that IB facilitated and aided the Brar Defendants' unlawful and unregistered investment activity. Id. The Court finds that these claims are sufficiently interrelated such that staying Plaintiffs' claims against the Brar Defendants pending the compelled arbitration is appropriate here. Cf. Summer Rain, 964 F.2d at 1461 (staying non-arbitrable issue of what monies were owed because it depended on the

resolution of the arbitrable issue of whether the defendants breached the contract at issue). Accordingly, this action is **STAYED** for the shorter of five (5) months or until arbitration is completed.

## VII. CONCLUSION

Accordingly, IB's Motions to Compel Arbitration (ECF No. 5 in Civil No. 2:16cv276 and ECF No. 6 in Civil No. 2:16cv277), are hereby **GRANTED**, and the instant action is **STAYED** for the shorter of five (5) months or until completion of arbitration, or until such further order that this Court may enter.

The Clerk is **DIRECTED** to forward a copy of this Order to all Counsel of Record.

**IT IS SO ORDERED.**

/s/
Robert G. Doumar
Senior United States District Judge

UNITED STATES DISTRICT JUDGE

Norfolk, VA
November 30, 2016